

09-CV-05558-CMP

Received From SEATTLE
SEP 16 2009

___ FILED    ___ ENTERED
___ LODGED   ___ RECEIVED

SEP 15 2009

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                                DEPUTY

*[margin: S6A28975 / Summons Iss. in blank]*

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WASHINGTON
# AT SEATTLE

UNITED STATES OF AMERICA, ex rel. by SHEILA REIBER,

    Plaintiff,

vs.

BASIC CONTRACTING SERVICES, INC., a New Mexico Corporation,

    Defendant.

NO. C09 5558 JRC

COMPLAINT AND JURY DEMAND

**Filed Under Seal**
pursuant to
31 U.S.C. §3730(b)(2)

COMES NOW the United States of America, by and through Sheila Reiber, qui tam as Relator, and for a cause of action alleges as follows:

## I. JURISDICTION and VENUE

1.1  Jurisdiction exists pursuant to 31 U.S.C. §3730(b)(1) and 31 U.S.C. §3732 in that this action seeks remedies on behalf of the United States of America for violations of 31 U.S.C. §3729 by the Defendants.

1.2  To the best of Relator's knowledge, the allegations or transactions upon which this suit is based have not been publicly disclosed in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit or

COMPLAINT AND JURY DEMAND - 1

Teller & Associates, PLLC
1139 34th Ave, Ste B
Seattle, WA 98122
(206) 324-8969  Fax: 860-3172

1  investigation, or from the news media. 31 U.S.C. 3730(e)(4)(A). Any knowledge obtained by the US Government was the result of a disclosure made by the Relator.

1.3  The Qui Tam plaintiff is the original source in that she "has direct and independent knowledge of the information on which the allegations are based." 31 U.S.C. §3730(e)(4)(B). She has been or will be providing information through this litigation, and previously provided information to agents of the United States Government, in connection with this matter.

1.4  Basic Contracting Services, Inc. ("BCSI" or "Defendant" herein) is a New Mexico corporation which resides and transacts business in Port Hadlock, Washington, within the Western District of Washington.

1.5  Venue exists in this District pursuant to 31 U.S.C. §3730(b)(1) in that Defendants are qualified to do business in the State of Washington and do transact substantial business in the District, and that the allegations comprising the complaint took place in substantial part here.

## II. PARTIES

2.1  Defendant Basic Contracting Services, Inc. is a non-Washington corporation which holds a contract to provide security services to Indian Island Naval Magazine in Port Hadlock, Washington.

2.2  BCSI was awarded a new contract for more than $15 million to provide Armed Guard Security Services including Harbor Patrol Services at Indian Island Naval Magazine from October 1, 2009 through September 30, 2014.

2.3  BCSI has held similar contracts with Indian Island Naval Magazine from 2001 through 2005 and from 2005 through 2009. A contract number for a 2005-2009 contract was N44255-05-C-7101.

2.4  BCSI provides similar services under similar contracts at other federal sites throughout the country, including, but not limited to, Glen Canyon Dam in Arizona and the

COMPLAINT AND JURY DEMAND - 2

Teller & Associates, PLLC
1139 34th Ave, Ste B
Seattle, WA 98122
(206) 324-8969  Fax: 860-3172

Navy Fleet Industrial Supply Center in Florida. On information and belief, BCSI conducts business at other military bases in a similar manner as that alleged herein.

2.5 Relator Sheila Reiber is an employee of BCSI, and has been employed by BCSI in the capacity of Armed Security Guard at Indian Island Naval Magazine since September 30, 2005.

### III. STATEMENT OF FACTS

3.1 Since approximately May 2009, Relator Reiber has been Unit Chairperson for the union to which BCSI's security guards belong. During the 2009 employment contract negotiations between BCSI and the union, Relator Reiber researched and found a copy of the new US Government (Navy) contract solicitation that that had been responded to by, and awarded to, BCSI for armed security guard services at Indian Island Naval Magazine. It is inconsistent with the way BCSI had been treating its employee guards under the prior contract with the government.

**A. BCSI is not paying its security personnel for guard mount.**

3.2 Armed Security Guards carry automatic and other lethal weapons. They must get into uniform and get armed (including checking out equipment), equipped, and briefed at the beginning of each shift. At the end of each shift, guards must get unequipped and unarmed and brief their relief. These periods before and after the shift are referred to as "guard mount."

3.3 The solicitation from BCSI for the 2009-2014 contract to provide security services at Indian Island Naval Magazine includes up to 30 minutes per shift in guard mount pay.

3.4 On information and belief, the 2005-2009 contract also includes guard mount pay.

3.5 BCSI guards at Indian Island do not receive pay for guard mount time.

3.6 BCSI is apparently aware that this is compensable time under Washington law. Project Manager Lou Allen has pressured guards not to claim any guard mount time on their timesheets. He has explicitly identified this as a cost-saving measure for BCSI.

Teller & Associates, PLLC
1139 34th Ave, Ste B
Seattle, WA 98122
(206) 324-8969  Fax: 860-3172

3.7   On or about August 21 2009, Relator Reiber learned that the Navy contracting officer informed an acquaintance of hers that the Navy was billed monthly for guard mount pay by BCSI. On information and belief, BCSI is billing the Navy for guard mount pay under the current contract even though the guards are not being paid for that time.

3.8   During the contract negotiations between the union and BCSI in 2009, Relator Reiber wrote and sent a proposal to BCSI President John Morgan. The proposal included guard mount pay for the guards. Mr. Morgan initially refused to pay the guard mount pay in the 2009-2014 contract, although it appears BCSI will be billing the Navy for that time.

**B. BCSI does not train Armed Security Guards adequately.**

3.9   The 2009-2014 contract between the U.S. Government and BCSI lists certain training requirements for all armed guards, including 120 hours of apprentice training and 40 hours of sustainment training.

3.10   These guards are protecting US Navy ordinance, presumably including nuclear weapons, from demonstrators, terrorists and foreign agents. They carry assault rifles and are expected to respond to circumstances including explosive and/or firearms assaults on the base by land or sea. Adequate training (in firearms, unarmed combat, vehicle and boat handling, first aid response, and other first responder duties) is a material term of the contract.

3.11   Apprentice training is to be completed prior to being assigned guard duties while sustainment training is to ensure that the guards keep their skills current.

3.12   The 2009-2014 contract also requires that accurate training logs be kept by BCSI.

3.13   On information and belief, previous contracts between BCSI and the U.S. Government included similar training requirements.

3.14   Before being assigned guard duties in 2005, Relator Reiber's training was limited to a physical fitness test and a firearm qualification test.

COMPLAINT AND JURY DEMAND - 4

Teller & Associates, PLLC
1139 34th Ave, Ste B
Seattle, WA 98122
(206) 324-8969  Fax: 860-3172

3.15 Most of Ms. Reiber's training was conducted while on shift. Only about 11 of the 120 required apprentice training hours were conducted while Ms. Reiber was off-duty.

3.16 Most of Reiber's apprentice training consisted of being given a folder of information to read while on post. When she was done reading, Ms. Reiber was asked to return the training material. Ms. Reiber was then required to sign a form acknowledging receipt of the training.

3.17 Relator's training referenced herein is typical for BCSI guard training in Relator's experience, indeed her training was more comprehensive than many.

3.18 Any guards trained after Ms. Reiber received similar or less training than she did.

3.19 Much of guards' sustainment training is also given while on shift.

3.20 As a result, posts are also left unmanned when personnel are completing on-shift training.

3.21 Some of the guards' required sustainment training is not given as often as required. For example, Physical Control Techniques should be covered quarterly, but Relator has only received this training once per year, while on shift.

3.22 Like the apprentice training, sustainment training often consists of a guard being given a folder of information to read while on shift. Guards are instructed to sign a document each quarter acknowledging that they received the training. Guards are told that if they do not sign, they must go home immediately.

3.23 Because of the foregoing, most or all BCSI security guards are not qualified under the contract to perform the duties for which their time is being charged to the US Government.

3.24 In some cases, guards have stood posts without being armed because they have not yet received gun qualification before being assigned duties.

**C. BCSI does not give guards required coxswain training.**

3.25  The 2009-2014 contract between the U.S. Government and BCSI requires that security personnel receive coxswain training. On information and belief, the previous contract also required coxswain training.

3.26  Coxswain training involves boat handling skills intended to protect government piers and ships from hostile watercraft and other dangers. For example, in some circumstances BCSI guards are expected to ram other boats to keep them away from Navy ships and facilities.

3.27  While on shift, Relator Reiber received five days of coxswain training, which mostly consisted of riding around in a boat without substantial instruction.

3.28  On information and belief, coxswain training varies for employees from eight days to one day. The variance in time requirements is not based upon experience.

3.29  The coxswain training has been conducted by a coworker. On information and belief the co-worker trainers are not certified instructors.

3.30  Because of the foregoing, most or all BCSI security guards are not qualified under the Contract to perform the water-craft based duties for which their time is being charged to the US Government.

**D. BCSI does not adequately man posts.**

3.31  The contract between the U.S. Government and BCSI requires a minimum of staff at each post that BCSI must guard.

3.32  BCSI does not keep the minimum number of staff at the required posts at all times. For example, under the 2005-2009 Contract, BCSI was required to keep a minimum of two staff at the Anderson Road post, 24 hours per day, seven days per week. On many shifts, Project Manager Lou Allen scheduled only one BCSI guard to the Anderson Road post.

3.33  On information and belief, the government is being charged for two guards and all other contractual requirements, even though not all requirements are fulfilled by BCSI.

**COMPLAINT AND JURY DEMAND - 6**

3.34  The 2009-2014 contract includes a provision that states that BCSI is in danger of losing its contract if any post is not adequately manned for more than 30 minutes during a shift. This provision may also appear in the previous 2005-2009 contract.

3.35  As referenced above, at times posts are left unmanned when personnel are completing on-shift training.

3.36  Swing Shift Lieutenant Ben Scott, a BCSI employee, allows guards to leave work early. In some cases, posts are left unmanned for two to three hours at a time.

3.37  On information and belief, the US Government is being charged for full details and full shift coverage although posts are left unmanned at times.

### E. BCSI conducts mysterious payroll practices.

3.38  Up until approximately March 2009, guard pay stubs would occasionally attribute some of the employee's time to "Other Pay."

3.39  When Relator Reiber asked Project Manager Lou Allen about the "Other Pay" category, Mr. Allen replied, "Don't worry about it. You're getting paid, aren't you?" Mr. Allen's wife provides the BCSI payroll services.

3.40  On information and belief, BCSI is using the "Other Pay" category to conceal its fraud to the government, claiming that this pay was for training or guard mount time.

### F. These are Fraudulent Misrepresentations.

3.41  BCSI bills the U.S. Government and receives payment under a contract that requires security personnel to receive guard mount pay, apprentice qualification and sustainment training, and coxswain training, and for posts to be adequately manned.

3.42  The defendant knowingly presented, or caused to be presented, to an officer or employee of the United States Government, false or fraudulent claims for payment or approval when it presented claims for the above referenced services under the prior contract(s) and current contract.

COMPLAINT AND JURY DEMAND - 7

Teller & Associates, PLLC
1139 34th Ave, Ste B
Seattle, WA 98122
(206) 324-8969  Fax: 860-3172

3.43 The defendant knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government when it presented claims for the above referenced services under the prior contract(s) and current contract.

3.44 The defendant's representations to the Government or its agent regarding billing for guard mount time were false representations of material fact.

3.45 The defendant's representations to the Government or its agent regarding billing and training logs for required apprentice, sustainment, and coxswain training were false representations of material fact.

3.46 The defendant's representations regarding the adequacy of training of guards constitute false representations of material fact.

3.47 The defendant's representations to the Government or its agent regarding manning of posts were false representations of material fact.

3.48 The defendant made these false representations of material fact knowingly as that term is defined in 31 U.S.C. § 3729(b), and with the intention that said representations would be relied upon by the government to its detriment.

3.49 The false representations were believed by the government and acted upon by the government to its damage.

3.50 These practices resulted in billing for more services and higher quality services than actually were provided, and resulted in BCSI receiving more money from the U.S. Government than it was entitled to.

**G. BCSI's behavior is part of a pattern and practice.**

3.51 On information and belief, BCSI's Project Manager at Indian Island, Lou Allen and President John Morgan, negotiate contracts between BCSI and the U.S. Government and set up BCSI operations at other federal sites where Government contracts are awarded.

3.52   Based on information and belief, the above-referenced fraudulent practices are part of a pattern and practice by BCSI to defraud the Government, and are not limited to the Indian Island base, but occur in other locations, including those referenced above. See e.g., *Williams v. BCSI*, Case 5:09-cv-00049 (D. W.Va. 2009) (alleging overbilling to government for janitorial services).

## IV. CLAIMS OF THE UNITED STATES

4.1   The facts stated above give rise to a violation of the Federal False Claims Act, 31 U.S.C. 3729(a)(1)-(3).

4.2   The defendant is liable for the actions of their agents, and their employees under the doctrine of Respondeat Superior.

## V. DAMAGES

5.1   The provision by BCSI of non-certified workers violates a material term of the agreement between the government and BCSI, making all services provided inadequate and out of compliance with the contractual requirements. As a proximate cause of the fraudulent practices described above, the United States of America has suffered damages in the full amounts fraudulently billed to the United States.

5.2   In the alternative, the under-qualified guards provide services of greatly lesser value than contracted for and paid for by the US Government, which has suffered damages in amounts reflecting the difference in pay between these guards and untrained minimum wage employees.

## VI. JURY DEMAND

8.1   Relator hereby demands that factual determinations in this matter be decided by a jury of 12 persons.

## VII. PRAYER FOR RELIEF

**WHEREFORE** plaintiff prays for damages as follows on behalf of the United States as appropriate:

1. Economic damages in an amount to be proven at time of trial.
2. A civil penalty per violation as allowed by the False Claims Act.
3. Treble damages as provided for in 31 U.S.C. §3729(a).
4. Prejudgment interest.
5. Reasonable attorney fees and costs.
6. Whatever additional damages the court shall deem to be just and equitable.

DATED this 14th day of September, 2009.

_____
Stephen A. Teller, WSBA #23372
Attorney for Relator Reiber